Filed:  September 22, 2011.

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Petitioner on Review,

v.

TERRY DEAN DAVIS,

Respondent on Review.

(CC 02C45953, CA A134216, SC S058641)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 7, 2011.

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause for petitioner on review.  Rolf C. Moan, Assistant Attorney General, filed the briefs.  With him on the briefs were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

George W. Kelly, Eugene, argued the cause and filed the brief for respondent on review.

WALTERS, J.

The decision of the Court of Appeals is reversed in part and affirmed in part.  The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

*Appeal from Marion County Circuit Court, Susan M. Tripp, Judge. 235 Or App 327, 230 P3d 987 (2010).

WALTERS, J.

In this criminal case, the state argues that the Court of Appeals erred in reversing one of the trial court's rulings excluding certain evidence. Defendant, in response, challenges two of the trial court's other evidentiary rulings excluding evidence, which the Court of Appeals had affirmed.[1] Defendant was charged with murder and manslaughter based on allegations that he shook the victim, his 15-month-old daughter, and inflicted fatal abdominal and brain injuries on the night that she died. Defendant contended that the victim's autopsy revealed that the victim had been injured at least several days before the night of her death and that nothing that he intentionally did to the victim on that evening caused the catastrophic brain hemorrhage that killed her. As relevant to this case, defendant attempted to introduce evidence that the victim had been subjected to physical abuse throughout her short life; that a friend of the victim's mother saw the victim four days before her death and concluded that the victim looked like the friend's own daughter, who had suffered a brain injury as a baby; and that that friend relayed that conclusion to the victim's mother. In each instance, the trial court excluded the evidence. Defendant was convicted of one count of murder and one count of manslaughter.

Defendant appealed his convictions to the Court of Appeals and that court

---

[1] Under ORAP 9.10(1), a party filing a response to a petition for review may include a contingent request for review of any question properly before the Court of Appeals.

reversed the judgment of the trial court, concluding that the trial court erred in excluding testimony that, four days before the child's death, a friend told the victim's mother that the victim resembled the friend's child, who had suffered a brain injury. *State v. Davis*, 235 Or App 327, 230 P3d 987 (2010). However, the Court of Appeals affirmed without discussion the trial court's rulings as to the evidence of the victim's prior physical abuse and the statement of the mother's friend that, four days before she died, the victim resembled the friend's own child, who had suffered a brain injury. *Id.* We granted the state's petition for review and, for the reasons that follow, now affirm in part and reverse in part the decision of the Court of Appeals,

Except where noted, the following facts are undisputed. Defendant's daughter, the victim in this case, was 15 months old when she died on June 30, 2002. The victim lived with her mother, Ecklund, and several of Ecklund's other children. Ecklund and defendant were not married and lived apart. The victim stayed with defendant overnight at his home from time to time.

The Court of Appeals described the events of the days preceding the child's death as follows:

"Ecklund, the victim, and Ecklund's other children vacationed in Mexico and California in the middle of June 2002. During the trip, the victim fell off a motel bed. Ecklund told police later that she 'couldn't get there fast enough' and that the victim hit the 'top of her head' in the fall. Ecklund testified, however, that the victim exhibited no signs of distress after the fall.

"Shortly after the family's return to Oregon, on June 24, the victim had an overnight visit with defendant. She returned to Ecklund's care the following day. On June 25, Ecklund noticed that the victim was not feeling well; she was vomiting and her eyes were 'glassy.' Ecklund asked her

2

friend Payne, a registered nurse, to stop by and examine the victim.[2] Payne did so and noticed that the victim was unresponsive. The trial court excluded as hearsay Payne's testimony that she had told Ecklund that the victim's condition looked just like that of Payne's daughter when she had suffered a traumatic brain injury years before. Payne tested the victim for dehydration by pinching the victim's skin and noticed that the victim's eyes were glassy and somewhat 'rolled up' in her head; Payne recommended that Ecklund have the victim examined by a doctor. During her testimony at trial, Ecklund did not recall Payne's visit or recommendation.

"Ecklund took the victim to Santiam Hospital a few hours after Payne's examination. There, the victim was evaluated, treated for dehydration and a viral infection, and given intravenous fluids. Her symptoms resolved, and the victim returned home the next morning.

"Defendant testified that, on June 29, around 7:00 p.m., he picked up the victim for an overnight visit. The victim was fussing and crying when defendant arrived, but showed no other signs of illness or injury. Once they arrived at defendant's home, defendant gave the victim a bath and changed her diaper. He then began doing some household chores while the victim, another child of defendant, and defendant's small dog played together in the garage. When defendant returned to the garage, he found the victim lying on her side on the floor. Defendant testified that the other child told him that the small dog had knocked over the victim. Defendant picked up the victim, but decided that she seemed unhurt.

"Later that evening, defendant ordered a pizza, which was delivered after 10:00 p.m. The victim was uninterested in the pizza, but ate a few pieces of pineapple. The victim spat up or vomited, and defendant testified that he noticed that the victim had a blank affect and had become limp. He called Ecklund at 10:58 p.m. to tell her that something was wrong with the victim and asked Ecklund to come to his house to help. A few minutes later, when Ecklund arrived, she found the victim limp and unresponsive and told defendant to call 9-1-1. Defendant made the call and told the dispatcher that the victim had recently eaten pineapple and spat up and that he was concerned about a possible allergic reaction.

"Paramedics arrived at defendant's home around 11:00 p.m. They

---

2  Ecklund testified that she did not recall calling Payne, Payne coming over to her home to look at the victim, or anything Payne may have said to her that day.

3

found the victim lying on the floor with defendant, Ecklund, and defendant's other child nearby. Defendant told the paramedics that the victim had not suffered any trauma, but had been sitting on the couch and went suddenly limp. The paramedics found the victim unresponsive but breathing, with a body temperature of 92.7 degrees. The paramedics also noticed a small bruise on her forehead and some bruising on her abdomen. The paramedics testified that Ecklund did not tell them about the victim's visit to Santiam Hospital several days previously. The paramedics decided to transport the victim to Salem Hospital after determining that she rated extremely low on a scale measuring brain functioning."

*Davis*, 235 Or App at 330-31.

Defendant and Ecklund followed the ambulance in a car to Salem Hospital. At Salem Hospital, doctors questioned Ecklund and defendant. Defendant told the emergency room physician that the child had not suffered any trauma or injury that evening, and had not experienced any vomiting or other illness. Ecklund did not mention her discussion with Payne, the victim's visit to the hospital four days earlier, or the victim's treatment for dehydration. Testing revealed that the victim had a subdural hematoma[3] and needed surgery to relieve the resulting pressure on the brain. Because Salem Hospital does not have pediatric neurosurgeons on staff, the treating physicians decided to transport the victim to Oregon Health Sciences University Hospital (OHSU) in Portland. At OHSU, doctors performed surgery to relieve the pressure on the victim's brain. Subsequent testing showed that the victim's brain was no longer functioning, and she was taken off life support on June 30, 2002.

---

[3]    A subdural hematoma is bleeding under the dura, the membrane that encases the brain.

4

A medical examiner performed an autopsy the next day. The autopsy revealed, among other things, that the victim had about a quart and a half of blood in her abdomen, which was due to tear in the mesentery, the lining of the abdominal cavity that connects to parts of the small intestine. In addition, the victim's brain was swollen, the subdural hematoma on the right side of the victim's head had been removed by the surgeons who had tried to save her, and the victim had retinal hemorrhaging and bleeding at the base of the optic nerve. The medical examiner later testified that the retinal hemorrhage and brain injury were caused by acceleration and deceleration of the victim's head, which would have been caused either by violent shaking, a violent shake followed by a slam, or a single slam. The medical examiner also stated that the injuries were "acute" and had to have occurred within 24 to 36 hours of the victim's death; according to him, the microscopic evidence was not consistent with an older abdominal injury. Finally, he concluded that the cause of the victim's death was homicide.

In addition to those findings related to the cause of death, the autopsy and a radiology test revealed that the victim had suffered other injuries in the weeks and months before her death. Among other things, the victim had healing fractures to three ribs and a healing fracture on the femur, as well as possible old fractures on her tibia and fibula.

Defendant was initially charged in 2002 with various crimes arising out of the victim's death, including murder by abuse and manslaughter. To support the murder-by-abuse charge, the state relied on, among other things, the healing leg and rib fractures and an expert's opinion that the victim had suffered child abuse. The case went to trial in

5

2003. At that trial, the victim's entire medical history was admitted into evidence. The jury found defendant guilty of manslaughter but could not reach a decision on the remaining charges, including murder by abuse. After that trial ended, the trial court declared a mistrial due to juror misconduct in that case. Defendant was reindicted in 2005; the state dropped the murder by abuse charge. Instead, at the criminal trial at issue here, the state's theory of the case was that the victim died on June 30, 2002, due to head and abdominal injuries that defendant intentionally inflicted on the victim on a particular date -- on or between June 29 and 30, 2002.

At a pretrial hearing about a year before the second trial, the trial court informed the parties that it intended to try a narrow case, given the new charges, and stated that defendant had agreed that, at that point, he did not intend to offer evidence of the victim's prior physical abuse unless he could establish that that physical abuse was directly related to the cause of the victim's death. However, at a pre-trial hearing closer to the trial date, defendant told the trial court that he intended to argue that evidence of the victim's prior physical abuse was relevant for a different purpose. Defendant reported that his experts had reached the conclusion that the fatal abdominal and brain injuries had been inflicted not on June 29 or 30 but at least several days before the victim's death, and that the victim died on June 30 as a result of a rebleed of the earlier injuries. Defendant told the trial court that, in reaching that conclusion, the experts had reviewed and relied on the victim's medical record, including the autopsy and radiologist's reports showing healing rib and leg fractures, demonstrating that the victim had been subjected to physical abuse throughout her life. Evidence of that abuse, defendant contended, was admissible

6

to explain the basis for the experts' conclusions.

The state objected, arguing that the parties had agreed not to delve into the details of the victim's prior physical abuse, and that the defense experts could testify about their conclusions as to when the injuries that caused the victim's death occurred without talking about all the details that they had relied on to reach them. Further, although the state agreed that the victim had been abused, the state argued that, because it was not clear when the victim was abused or who had abused her, evidence of the prior abuse would be confusing and misleading to the jury and would distract the jury from the real issues in the case -- what injury caused the victim's death and when it happened.

The trial court excluded the evidence of the prior physical abuse. The trial court first explained that that evidence was not relevant because the defense could not tie the prior abuse, including the healing fractures, to the abdominal and brain injuries that caused the victim's death. Further, the court explained, even if evidence of prior physical abuse were relevant, it would be inadmissible under OEC 403,[4] because the probative value of the prior abuse was outweighed by the danger of confusion of the issues for the jury. The court also concluded that the evidence of the abuse was inadmissible under

---

[4] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

OEC 404(3),[5] because there was no indication of who had inflicted the prior injuries or whether the prior injuries were the result of an improper act. And, even if there were, the court stated, the evidence would not be admissible to show that the person who inflicted the injuries that led to the victim's death acted in conformity with his or her prior conduct, and there was no suggestion that defendant was offering the evidence for any of the permissible reasons under OEC 404(3): to show motive, opportunity, intent, preparation, plan, knowledge, identity, or lack of mistake or accident. Finally, the court ruled that none of the evidence of prior injuries was admissible to support the opinions of either the state's or defendant's experts, unless the experts could tie a particular past injury to the cause of the victim's death:

> "They are not going to say that this was a battered child, and that's not going to come up in their diagnosis, they're not going to talk about that in their testimony, they're not going to talk about other injuries unless they can tie them to the death."[6]

During the trial, various state witnesses testified that the victim appeared

---

[5] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[6] The court also ruled that evidence of any particular hospital visit or medial contact may be admissible to the extent that the defense could "tie it to your rebleed theory or * * * to your abdominal injury theory." At trial, defendant did not attempt to show that the victim died as a direct result of any of the particular injuries evidenced in the victim's medical records.

8

normal during the day before defendant picked her up from her mother's home -- that she ate and drank normally, and that she did not seem to be in any pain. The state presented the testimony of the doctors who treated the victim, the medical examiner, and other experts who viewed the victim's records, to the effect that the abdominal and brain injuries that the victim suffered were not accidental and that it would have taken severe blunt force trauma to inflict them.[7] Those witnesses also testified that the abdominal injury would have been quite painful, the victim would not have been able to eat afterward, and that the head injury would have produced immediate and obvious symptoms -- the victim would have lost coordination and she would not have been able to eat or swallow. Those facts led the medical examiner to conclude that the abdominal injury occurred after the victim ate pieces of pineapple on the pizza that was delivered after 10:00 pm on June 29 and that the head injury occurred at some time thereafter.[8]

As noted, defendant's theory of the case was that the victim's injuries were intentionally inflicted, but that the injuries occurred at least several days before the evening of her death. Defendant's experts testified that the abdominal injury showed microscopic signs of healing that would not have been evident unless the injury were at

---

[7] The medical examiner testified that it was possible that the abdominal injury occurred accidentally, from, for example, falling off a bed or couch onto a protruding toy.

[8] The radiologist at Salem Hospital agreed that there had been a recent brain injury, but he also testified that there might have been an additional, existing subdural hematoma, which could have been up to three weeks old.

least several days old. Moreover, those experts testified that CT scans and x-rays showed evidence of an older trauma to the dura around the brain and that photos taken at the autopsy revealed that clotting had begun to occur there. In that regard, one expert testified that the brain injury was at least five days old. Defense witnesses opined that the abdominal injury worsened over time, with the mesentery rupturing and the bleeding consequently accelerating, causing coagulopathy, or an inability of the body to clot properly. That, in turn, caused the existing subdural hematoma to rebleed, leading, ultimately, to the victim's death.

Defendant's experts testified that the child could have appeared normal after suffering the earlier abdominal injury and the brain injury, including eating, drinking, and eliminating normally. In addition, witnesses stated that the abdominal injury might not have caused constant pain, after the initial blow, because the mesentery tear was in the back of the abdomen, and, if the mesentery had ruptured on the night of the victim's death, the victim would have experienced unquenchable thirst, which would have driven her to eat the pineapple from the pizza. Finally, one of defendant's witnesses testified that the early symptoms of a deteriorating abdominal trauma were exactly the same as the symptoms with which the victim presented at Santiam Hospital four days earlier, on June 25, leading that expert to conclude that the victim already had the abdominal injury at that time.

Defendant also attempted to offer testimony by Ecklund's friend, Payne, that, on June 25, Payne thought that the victim looked like her own daughter, who had suffered a brain injury when she was a child, when she had pressure on the brain or was

10

dehydrated, and that Payne had relayed that belief to Ecklund. Defendant made an offer of proof that Payne would have testified that she had known Ecklund for about 10 years and that, on June 25, Ecklund called her over to her house to look at the victim, who was not well. In the offer of proof, Payne testified that, on that afternoon, the victim was lying on a cushion on the floor, lethargic. She described the victim as looking off to one side, her eyes rolled back to the right and bulging and her pupils enlarged. Payne testified that she thought that the victim resembled her own daughter when she was the victim's age, when her daughter was suffering from swelling in the brain or was dehydrated. Payne explained that her daughter, at three months of age, had suffered a traumatic brain injury as a result of a car accident and had been hospitalized many times and had undergone many brain surgeries. Payne acknowledged that she could not tell whether her daughter was suffering from brain swelling or dehydration when her child's eyes were bulging, rolled back, and non-reactive, but she recognized that those symptoms were triggered by one of the two conditions. In addition, Payne testified that she told Ecklund that the victim reminded her of her daughter when she was that age, and she recommended that Ecklund take the victim to the hospital to be examined. Finally, Payne testified that Ecklund knew that her daughter had been in a car accident as an infant and had suffered a serious brain injury.

The trial court ruled that Payne could testify that she came to Ecklund's house as a family friend at around 4:00 in the afternoon, could describe how the victim looked when Payne saw her that afternoon, and could testify that she told Ecklund that she thought that the victim might be dehydrated. However, the court excluded the

11

remainder of Payne's proffered testimony. In particular, the court ruled that Payne's statements to Ecklund that the victim reminded her of her daughter were hearsay, and, to the extent that that testimony might have been admissible nonetheless to show its effect on the listener, the court found that it was unclear what Ecklund might have understood Payne to mean. In addition, the court ruled that any testimony regarding Payne's daughter was irrelevant. Finally, it rejected defendant's argument that Payne's statement that the victim looked like her daughter when her daughter's brain was swelling was admissible as lay opinion testimony under OEC 701, which permits opinion testimony by lay witnesses if it is rationally based on the perception of the witness and is helpful to the determination of a fact in issue.[9] In that regard, the court ruled,

> "I think that there is far too much possibility for the fact that it really was speculation or conjecture or -- and she was not certain. And, for that reason, I am not going to allow it in."

As noted, the Court of Appeals rejected without discussion defendant's challenges to the trial court's rulings respecting the victim's prior injuries and hospital

---

[9] OEC 701 provides:

"If the witness is not testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are:

"(1) Rationally based on the perception of the witness; and

"(2) Helpful to a clear understanding of testimony of the witness or the determination of a fact in issue."

12

visits and Payne's lay opinion that the victim looked like she may have been suffering from a brain injury on June 25. *State v. Davis*, 235 Or App at 334. The court, however, reversed the trial court's ruling excluding Payne's testimony that she told Ecklund on June 25 that the victim reminded her of her daughter. In evaluating that issue, the Court of Appeals began by observing that, although the trial court excluded that testimony as hearsay, it was not hearsay, because it was not offered to prove the truth of the matter asserted, *viz.*, that the victim reminded Payne of her daughter. *Id.* at 335. Rather, it was offered to show that Payne told Ecklund, in effect, that the victim looked like she was suffering from a brain injury and that Ecklund did not report that concern to hospital staff at Santiam Hospital later that day, or to the paramedics who were called to defendant's house on June 29, or to any of the doctors at Salem Hospital or OHSU who treated the victim on the night of her death. Defendant had argued that the victim's injuries occurred several days before June 29, when the victim was not in his care, and that Ecklund knew something about those injuries and had hidden that information from care providers. Defendant argued that Payne's testimony supported that contention.

The Court of Appeals agreed with defendant. The court stated:

"Payne's testimony about Ecklund's knowledge of the victim's potential brain injury was relevant under OEC 401. That fact had a tendency to make more probable the existence of deliberate nondisclosures by Ecklund of that condition to treatment providers. Those deliberate nondisclosures, in turn, were of consequence to the defense theory that the victim's injuries had been previously incurred. Thus, the proffered evidence assists in establishing the relevance of other evidence, namely, the testimony of the paramedics and emergency room doctors who said that Ecklund never told them about the possibility of an earlier brain injury. That evidence supports the inference that Ecklund was hiding her knowledge about the victim's prior injuries. The evidence is relevant, and

13

the court erred in ruling that it should be excluded."

*Id.* at 336.

The Court of Appeals noted that the exclusion of relevant evidence does not require reversal if there is little likelihood that the error affected the verdict, that is, if the error is harmless. *Id*. The court then characterized the proper inquiry for evaluating harmlessness as follows: "where there is convincing evidence of the defendant's guilt in the record as a whole, and little, if any, likelihood that the error affected the jury's verdict, then the error is harmless." *Id.* Applying that standard to the facts of the case, the court concluded that the error was not harmless:

> "The record, in short, did not contain evidence of guilt that was so substantial and convincing that evidentiary error could be presumed to be harmless. Instead, the jury was required to discern whether the state's evidence concerning the timing of the victim's injuries constituted proof beyond a reasonable doubt of defendant's guilt, in light of the contradictory scientific explanation offered by defendant's experts. Any evidence of prior injury to the victim's brain might have tipped the balance in defendant's favor. The evidence that Ecklund hid information suggesting an earlier injury was significant."

*Id*. at 337.

The state seeks review of that decision, arguing that evidence of Payne's statement to Ecklund on June 25 and Ecklund's reaction to that statement were not offered for their truth -- that is, that the victim, in fact, had a brain injury on June 25, 2002 -- and, therefore, were not relevant to the crucial factual question before the jury, *viz*., whether the victim's brain injury was inflicted on June 29, 2002. In addition, the state contends that Court of Appeals misapplied the standard for harmless error; properly considered, the state contends, the excluded evidence in this case was unlikely to have

14

affected the verdict, and any error, therefore, was harmless.

Defendant counters that the Court of Appeals was correct to reverse the trial court's ruling on that point. Additionally, defendant repeats his argument that the trial court erred in excluding evidence of the victim's past injuries and evidence of Payne's lay opinion that the victim looked on June 25 as if she were suffering from a brain injury.

All of the parties' arguments in this court require a determination of whether each piece of evidence was relevant. As this court often has stated, the relevance standard for admissibility is a low bar. *State v. Salas-Juarez*, 349 Or 419, 427, 245 P3d 113 (2010); *State v. Sparks*, 336 Or 298, 307, 83 P3d 304 (2004). Under OEC 401,

> "'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probably than it would be without the evidence."

That means that evidence is relevant "so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Barone*, 329 Or 210, 238, 986 P2d 5 (1999). And, as the court recently stated in *Salas-Juarez*, "the inference that the proponent of the evidence wishes to be drawn from the evidence need not be the necessary, or even the most probable, one." 349 Or at 428. Our review of the trial court's decision to exclude evidence on relevance grounds is for errors of law. *Sparks*, 336 Or at 307-08.

*Evidence Concerning Payne's Observation of the Victim*

We turn first to the trial court's rulings concerning Payne's testimony. Because the two issues are related, we consider the state's argument that the Court of

15

Appeals erred in reversing the trial court's exclusion of Payne's testimony concerning what she told Ecklund on June 25, 2002, together with defendant's argument that the Court of Appeals erred in affirming the trial court's exclusion of Payne's lay opinion testimony.

It is helpful to our analysis to set out the relevant part of Payne's testimony from defendant's offer of proof. In response to defendant's question about what Payne saw when she first arrived at Ecklund's home on June 25, Payne responded,

"[Payne:] Well, the thing that I observed was [the victim] was laying on the floor on the pallet, down sort of in front of the couch, sort of back by a coffee table, and [Ecklund] was there and she was down there by her, and one of [Ecklunds's] friends, I do believe her name was Kelly, was there. And [the victim] I remember laying there on her back. And as a mother of somebody that's had a child that's had 15 brain surgeries, my instant thought by looking at her is, *Oh, my gosh, there's [Payne's daughter] when she was young, when she had pressure on the brain or else she was dehydrated.*

"* * * * *

"She was laying there on her back with her arms sort of up and she looked lucid [sic]. She was looking off to one side, and her eyes were sort of rolled up to the right and they were sort of bulgy and the pupils were dilated -- excuse me, they were enlarged."

(Emphasis added.) Defendant then asked Payne to explain her daughter's injury, to put her observations of the victim in context. Payne answered,

"[Payne:] When [Payne's daughter] was three months old, I had a car wreck which caused a skull fracture. She has a shunt. Her first surgery was done probably within the first two weeks of her skull fracture, and before that her signs were her eyes would roll up and go up, and all I could see was mainly a lot of the white part. But after her first brain surgery, we ran into problems with dehydration as she was still with the bottle and she didn't talk * * *. She had multiple hospitalizations for dehydration. * * * [O]ne minute she would look just fine and then the next minute she was just

16

lucid [sic]. * * * And of course, as [Payne's daughter] got older, it was easier for me to pick up the signs of her not feeling well.

"[Defense Counsel:] Okay. What would those signs be?

"[Payne:] Some of the signs would be her eyes being bulgy and not reacting, the size of her pupils not being equal, the way that she would just lay around.

"* * * * *

"[Defense Counsel:] And in your taking care of your daughter * * * over that period of time, did you come to understand that those very signs and symptom were triggered by either brain swelling or problems that needed to be relieved?

"[Payne:] Well, over time -- it's hard to tell because with having a shunt, if you're dehydrated, the shunt is going to collapse and it's going to stick to the side of the brain, and so there's no fluid in there for the shunt to go across. And you think of dehydration * * *.

"So for me to say to look at [the victim] and say she was dehydrated versus a head injury, I could not do that because it was hard for me to distinguish the two because she -- my daughter always had multiple things going on."

Later in the offer of proof, Payne also testified that she told Ecklund that the victim's condition that day reminded her of her daughter. The trial court attempted to clarify what, exactly, Payne had said to Ecklund:

"THE COURT: What I heard you say, and I -- and so I want to make sure that I understand what you're saying, is that you told her that it reminds you of [Payne's daughter].

"[PAYNE]: Correct.

"THE COURT: Did you say anything more than that? Did she -- when you said it reminds you of [Payne's daughter], would she know what that meant?

"[PAYNE]: Yes."

On redirect examination, defendant's lawyer asked Payne to elaborate on the foregoing.

17

Defense counsel asked Payne whether she had shared her daughter's history with Ecklund, including the facts that Payne's daughter had been in a motor vehicle accident, that she had suffered a brain injury, and that she had been hospitalized many times. Payne answered in the affirmative, and added that Ecklund knew that her daughter had impaired intellectual and motor functioning. Payne concluded,

> "[Payne:] I think she -- I assumed as when I said that, she reminded me of [Payne's daughter], as when [Payne's daughter] was in the state of being really sick."

As noted, with respect to Payne's testimony that she told Ecklund that the victim reminded her of her own daughter, the trial court erroneously first ruled that that statement was hearsay. The court then added that, even if defendant were offering the statement for its effect on Ecklund,

> "it's speculative as to what that could have meant to her. And so that, I think, causes * * * the Court the concern about whether or not I should let it in at all, the fact that -- that Ms. Ecklund may or may not have known what that really meant. The witness' statement was that -- [']I assume that she understood I meant she was really sick.['] 'Really sick' isn't what I think the defense is trying to get it in for."

The trial court also ruled that, "[i]f that testimony is out," then Payne's testimony concerning her daughter also was inadmissible, because it was not relevant to any issue before the jury. In addition, the court ruled that Payne's testimony that the victim looked like she may have been suffering from a brain injury was inadmissible as lay opinion under OEC 701, because Payne was not certain about her opinion that the victim might have been suffering from a brain injury. At the same time, the trial court permitted Payne to testify that she believed that the victim may have been suffering from dehydration.

18

The court also permitted Payne to testify about her observations of the victim's condition when Payne arrived at Ecklund's home on June 25.

The Court of Appeals reversed the trial court's ruling concerning Payne's statement to Ecklund, but affirmed the ruling on Payne's lay opinion. *Davis*, 235 Or App at 337.

The state argues that the Court of Appeals' decision respecting Payne's statements to Ecklund is incorrect because it relies on several attenuated and cumbersome inferential steps that lack a factual predicate. The state argues that, at best, one could infer from Payne's statement to Ecklund that the victim reminded her of her own daughter that *Ecklund believed* that, on June 25, the victim showed symptoms of brain injury. However, the state contends, that inference does not support the further inference that, on June 25, the victim in fact had a brain injury. And, in any event, the fact that Ecklund believed that the victim showed symptoms of brain injury on June 25 was not relevant, because it would not have helped to establish that any June 25 injury played a role in the victim's death.

The state asserts that the indictment charged defendant with causing the victim's death on or between June 29, 2002, and June 30, 2002, and, therefore, the dispositive issue for the jury was whether the symptoms that the victim displayed on June 29 and 30 necessarily reflected fatal injuries that must have been inflicted on June 29 or 30, when the victim was in defendant's care. According to the state, at most, the excluded statement could have established what Ecklund was told about the victim's symptoms on June 25 and what Ecklund believed about those symptoms on that date; it

19

would not have assisted the jury in deciding, as a medical matter, whether any June 25 injury contributed to the victim's death.

Although the trial court concluded that it was not clear what Payne's statement to Ecklund that the victim reminded her of her own daughter would have meant to Ecklund, the Court of Appeals paraphrased Payne's statement as "testimony about Ecklund's knowledge of the victim's potential brain injury." *Davis*, 235 Or App at 336. As is evident from our description of the state's argument to this court, the state appears to accept that paraphrase as accurate. We agree. It is clear from Payne's testimony that she and Ecklund had known each other for a long time, that Payne had told Ecklund about her daughter's medical history, and that anyone talking to Payne's daughter would recognize her intellectual and motor limitations. We think it is reasonable to infer from those facts that Ecklund would have understood that, when Payne said that the victim reminded her or her own daughter, she meant that the victim looked like someone with a brain injury.

However, we also agree with the state that evidence that Ecklund was told, on June 25, that her child looked like someone with a brain injury was not relevant to the jury's determination whether defendant inflicted fatal injuries on June 29 or 30 or whether, rather, on June 25, the victim already was suffering from the injuries that caused her death a few days later. Assuming, *arguendo*, that, based on Payne's statement to her on June 25, Ecklund had reason to fear, or even believed, that the victim was suffering from a brain injury that day, we do not think that Ecklund's knowledge of that possibility is relevant to the jury's determination whether the child, in fact, was then suffering from

20

the injuries that ultimately killed her. It is undisputed that Ecklund took the victim to the hospital that day, and that, over the course of several hours, the victim was fully examined and subjected to testing to determine what was wrong with her. Ecklund's "deliberate withholding" of her fear (or belief) on that day does not make it more likely that the victim actually was then suffering from a brain injury. Even under the low threshold for relevance, Ecklund's belief in the possibility of a brain injury on June 25 does not, even slightly, either increase the probability that the defense rebleed theory was the correct one, or decrease the probability that the fatal injuries occurred on June 29 or 30, while the victim was in defendant's care.

The doctors who examined the victim on June 25 concluded that she was dehydrated. They treated her for that condition and the victim appeared to respond favorably to that treatment. Once Ecklund was informed of that medical diagnosis of her daughter's condition, Ecklund had no further reason to report Payne's observations to trained paramedics or emergency room doctors. It follows that nothing at all can be inferred from Ecklund's failure to relay Payne's statement to those who examined the victim on June 29.

For those reasons, we hold that the trial court did not err in excluding Payne's statement that she told Ecklund that the victim reminded her of her own daughter. The Court of Appeals erred in holding to the contrary.

We turn to the related issue: whether the trial court erred in excluding the remainder of Payne's testimony, in which she explained her daughter's condition and stated that the victim looked like her daughter when she was the victim's age and when

21

she was suffering from her brain injury or was dehydrated. Defendant argues that that testimony is admissible as lay opinion under OEC 701 and that the trial court erred in excluding it. For convenience, we set out that rule again here:

> "If the witness is not testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are:

> "(1) Rationally based on the perception of the witness; and

> "(2) Helpful to a clear understanding of testimony of the witness or the determination of a fact in issue."

> OEC 701 provides a "liberal standard for the admissibility of lay opinion"

and permits a "shorthand" description of what the witness perceived, which is, in reality, an opinion. *State v. Lerch*, 296 Or 377, 383, 677 P2d 678 (1984). As Justice Unis explained in his concurring opinion in *State v. Tucker*, 315 Or 321, 340, 845 P2d 904 (1993), the requirement in subsection (1) that lay opinion must be "rationally based on the perception of the witness" has two limitations. The first comes from OEC 602: the witness must have personal knowledge of the facts from which the opinion or inference is derived.[10] The second is that

---

[10]     OEC 602 provides:

> "Subject to the provisions of [OEC 703] [dealing with expert opinion testimony], a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness."

OEC 703 provides an exception to that rule for expert testimony, which does not need to be based on personal knowledge. That rule provides:

> "there must be a rational connection between the opinion or inference and the perceived factual basis from which it derives. The rational connection requirement means only that the opinion or inference advanced by the witness is one which a normal person could form on the basis of observed facts."

*Id.* Subsection (2) provides that, to be admissible, lay opinion must be "helpful" to the jury. As this court stated in *State v. Wright*, 323 Or 8, 17, 913 P2d 321 (1996), "[t]he concept of 'helpfulness' in OEC 701 subsumes a relevancy analysis." That is, as OEC 701 itself provides, lay opinion evidence is helpful only if it is relevant either to "clear understanding of testimony of the witness or the determination of a fact in issue."

As the court explained in *Lerch*,

> "[a]n essential difference between opinion testimony by a lay witness and an expert witness is that the lay witness is restricted to his personal perceptions while an expert witness may also testify from facts made known to him at or before the hearing."

296 Or at 384 (internal quotation marks omitted).

Lay opinion is commonly admissible on a variety of topics. For example, the Commentary to the Oregon Evidence Code officially approves lay opinion on the following subjects: (1) the speed of an automobile, (2) the identity of a person, (3) the appearance of another person, (4) the sound of footsteps, (5) footprints, (6) distance, (7) uncomplicated illness or injury, and (8) apparent age. 1981 Conference Committee

---

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Commentary to the Oregon Evidence Code. In addition, Oregon case law recognizes that "lay witnesses are capable of offering an opinion as to whether a person is intoxicated." *State v. Wright*, 315 Or 124, 132, 843 P2d 436 (1992). *See also State v. Clark*, 286 Or 33, 38-40, 593 P2d 123 (1979) (lay testimony that a defendant lacked signs of intoxication admissible to impeach result of chemical breath test even absent any foundation laid by expert testimony). Further, a lay witness may give an opinion that a stain on the floor was fecal matter. *Lerch*, 296 Or at 384.

A lay witness and an expert may testify as to the same subject matter:

> "'The testimony of the chemist who has analyzed blood, and that of the observer who has merely recognized it by the use of the senses belong to the same legal grade of evidence, and though the one may be entitled to greater weight than the other with the jury, the exclusion of either is not sustainable.'"

*Id.*, (quoting Clifford S. Fishman, 2 *Jones on Evidence*, § 14:4, 591-592 (6th ed 1972)). In fact, if the requirements of OEC 701 are met, lay opinion on subjects well outside the purview of most people is admissible. For example, in *Lerch*, a witness who had served in an infantry unit with the United States Army for 13 months during the Korean conflict was allowed to testify that he recognized the smell of decomposing human flesh in a dumpster, notwithstanding that that smell would be a "rare experience to the average person," because the witness's opinion was "rationally based on his perception in that he had previously experienced and recognized" that smell. *Id*. at 387, 388.

Applying those standards, we conclude that Payne's testimony that the victim looked like her own daughter when her daughter "had pressure on the brain or else she was dehydrated," as well as the background information about her daughter's

24

condition, which explained the basis for her opinion testimony about the victim, satisfied the requirements of OEC 701.

At the outset, it is important to observe that defendant's offer of proof did not include testimony by Payne that, in her opinion, the victim actually was suffering from a brain injury on June 25. Only an expert could make that medical diagnosis.[11] Rather, in the offer of proof, Payne was asked to describe what she saw when she arrived at Ecklund's home. In addition to describing the victim's physical appearance, Payne testified that her immediate thought was that the victim looked like her daughter when she was young and "had pressure on the brain or else she was dehydrated." Thus, Payne did not testify from the perspective of a physician who has diagnosed a patient, but from the perspective of an observer describing a person's appearance by associating it with a medical condition, much as a witness may describe a person's behavior and appearance by saying that the person looks intoxicated.

Although a person without Payne's prior experiences may not have been able to describe the victim's appearance in those terms, Payne was able to do so because,

---

[11] As this court stated in *Ritter v. Sivils*, 206 Or 410, 413, 293 P2d 211 (1956), "[i]f the issue turns upon some fact beyond the ken of laymen, expert testimony must be produced." In the same vein, in *Uris v. Compensation Department*, 247 Or 420, 424, 427 P2d 753 (1967), this court quoted with approval the following, from *Spivey v. Atteberry*, 205 Okla 493, 494, 238 P2d 814 (1951):

"[W]here injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, the question is one of science and must necessarily be determined by testimony of skilled, professional persons."

like someone who has seen blood or smelled decomposing human flesh, she often had observed the appearance of her child when she displayed the effects of pressure on the brain or dehydration. Payne's opinion that the victim resembled her daughter when her daughter was suffering from one of those two conditions was rationally based on her perceptions, in that she had a lifetime of previous experience with her own child suffering those conditions.

Payne's testimony also was "helpful to a clear understanding of testimony of the witness or the determination of a fact in issue." Payne's testimony was consistent with and helpful to corroborate the testimony of defendant's expert witnesses, based on their examination of the physical evidence, that the victim's brain and abdominal injuries occurred at least several days before she died. The state's experts testified that the fatal injuries had to have been inflicted on the night of her death.[12] Payne's testimony that, on June 25, the victim resembled her child when her child displayed the effects of a brain injury or was dehydrated was relevant. It increased the probability, even if only slightly, that the defense experts were correct and the state's experts incorrect.

The state argues that, given that Payne was allowed to testify as to her observations of the victim's condition on June 25, the excluded evidence would not have made it any more probable that the victim had a brain injury on June 25. However, we

---

[12] However, as noted, one of the state's experts, the radiologist at Salem Hospital, testified that the victim also had a preexisting brain injury, which might have been inflicted as long as three weeks before her death.

think that Payne's opinion that, on that date, the victim resembled her own child when her child was suffering from pressure on the brain (or dehydration) is qualitatively different from a description of the victim's symptoms, in much the same way that a witness's opinion that a person looks intoxicated is qualitatively different from the simple observation that a person is disheveled or flushed or glassy-eyed. In both cases, the shorthand reference conveys a picture to the jury that is more complete than a mere list of physical characteristics. Payne's opinion, on June 25, that the victim resembled her child when she was suffering from a brain injury made it more probable that the victim did, in fact, have a brain injury on June 25. And, if the victim already was suffering from a brain injury on June 25, that fact, in turn, made it more probable that the victim died as a result of an injury inflicted on or before that date and not on June 29 or 30, as the state alleged.

In excluding Payne's lay opinion testimony, the trial court did not evaluate that testimony in light of the requirements of OEC 701. That is, the court did not consider whether that testimony was rationally based on Payne's perception or whether she had personal knowledge of the facts on which she based her opinion.[13] Rather, the court excluded that testimony because "it really was speculative or conjecture or -- and

---

[13]    In fact, as discussed above, the trial court's only ruling concerning evidence relating to Payne's experience with her daughter was that, in light of the court's ruling that Payne's statement to Ecklund that the victim resembled her daughter was inadmissible because the court believed it was unclear what that statement would have meant to Ecklund, testimony about Payne's daughter was inadmissible because it was not relevant to any issue before the jury.

she was not certain."

We agree that Oregon's lay opinion rule precludes opinions based on conjecture or speculation, because opinions based on speculation or conjecture generally are not based on the perception of the witness or on the witness's personal knowledge. Laird C. Kirkpatrick, *Oregon Evidence* § 701.03[3], Art VII-572 (5th ed 2007) (so stating); *see also Brown v. Spokane, P. & S. Ry. Co.*, 248 Or 110, 122, 431 P2d 817 (1967) (under pre-OEC law, guesses or conjecture not admissible testimony and would not suffice as substantial evidence of a fact). However, OEC 701 does not require certainty, as long as it is clear that the witness's opinion is based on personal knowledge and not guesswork. Kirkpatrick, *Oregon Evidence* § 701.03[3] at 573.

Payne's opinion that the victim looked like her child when she "had pressure on the brain or else she was dehydrated" was not based on "speculation or conjecture." It was based on Payne's personal knowledge of her own daughter's appearance when suffering from one of those two conditions. Payne was offering her lay opinion concerning the victim's appearance as a mother of a brain-injured child; she did not purport to be an expert or to diagnose the victim's condition. Payne's opinion was rationally drawn from her perceptions, even though those perceptions were, as she herself acknowledged, susceptible to more than one plausible interpretation. As this court stated in *Salas-Juarez*, 340 Or at 428, "the inference that the proponent of the evidence wishes to be drawn from the evidence need not be the necessary or even the most probable one." Similarly, the inference that the victim was suffering from a brain injury on June 25 was not the only inference that could be drawn from Payne's observations of the victim's

28

condition. The jury could have inferred that the victim was suffering from dehydration instead. However, Payne's complete observations were, nonetheless, helpful to the jury, insofar as they increased the probability, even if slightly, that defendant's experts were correct that, on June 25, 2002, the victim already had suffered the brain injury that eventually killed her.

As is evident from the foregoing, we conclude that the trial court erred in ruling that Payne's inability or unwillingness to state unequivocally that the victim looked like she was suffering only from a brain injury showed that she was simply guessing or speculating about the victim's condition. Because that was the sole reason that the trial court gave for excluding Payne's lay opinion testimony, and because Payne's opinion was relevant, rationally based on her perceptions, and helpful to the jury, we conclude that the trial court erred in excluding Payne's lay opinion in which she stated that the victim resembled her daughter when she was experiencing brain swelling.[14] The trial court also erred in excluding Payne's testimony explaining her daughter's injury and resultant condition, because that testimony was essential to the jury's understanding of Payne's qualifications to offer her lay opinion.

It is axiomatic that not every evidentiary error requires reversal. Under

---

[14] The trial court did not weigh the probative value of Payne's lay opinion testimony against the danger of unfair prejudice resulting from its admission, under OEC 403, and we express no opinion about the proper result of any such weighing on retrial in this case.

29

Article VII (Amended), section 3, of the Oregon Constitution,[15] error is "harmless" and does not require reversal whenever the court is of the opinion "that the judgment of the court appealed from was such as should have been rendered in the case." *See State v. Willis*, 348 Or 566, 571, 236 P3d 714 (2010) (so defining harmlessness). Before we turn to an analysis of the prejudicial effect of the trial court's error in excluding Payne's lay opinion testimony, however, we consider the state's criticism of the Court of Appeals' harmless error analysis.

In its opinion, the Court of Appeals cited this court's opinion in *State v. Walton*, 311 Or 223, 809 P2d 81 (1991), as the standard for evaluating harmless error. *Davis*, 235 Or App at 336. In *Walton*, this court stated that error is harmless if (1) there is convincing evidence of the defendant's guilt in the record as a whole, and (2) there is little, if any, likelihood that the error affected the verdict. 311 Or at 231. However, as the state points out, this court's case law has evolved since *Walton* was decided. In *State v. Davis*, 336 Or 19, 30, 77 P3d 1111 (2003), this court clarified that it had eliminated the first of those two criteria as an independent consideration in the harmless error analysis.

---

[15]     Article VII (Amended), section 3, provides, in part:

"In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict * * * If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]"

In *State v. Hansen*, 304 Or 169, 743 P2d 157 (1987), this court acknowledged that OEC 103(1)[16] and Article VII (Amended), section 3, of the Oregon Constitution permit consideration of those two factors in determining whether a trial court's evidentiary error warrants reversal, but held that there was no justification for analyzing those two criteria separately, because the applicable constitutional and statutory standards are fully expressed in the second criterion. 304 Or at 180. As the court in *Hansen* went on to state,

> "[w]hether there was substantial and convincing evidence of guilt is not the issue; the issue is whether the error was likely to have affected the result. Of course, the less substantial the evidence of guilt, the more likely it is that an error affected the result, but that is an additional reason not to bifurcate the standard so as to require two independent inquiries."

*Id.* The court in *Davis* noted that, in *Walton* and in another case decided after *Hansen*, *State v. Parker*, 317 Or 225, 233, 855 P2d 636 (1993), this court repeated the erroneous bifurcated test for affirmance despite error. Nonetheless, the *Davis* court emphasized that

> "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as fact-finder, would regard the evidence of guilt as substantial and compelling.
>
> "In determining whether the error affected the verdict, it is necessary that we review the record. However, in so doing, we do not determine, as a

---

[16] OEC 103(1) provides:

"Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"

fact-finder, whether the defendant is guilty. That inquiry would invite this court to engage improperly in weighing the evidence and, essentially, retrying the case, while disregarding the error committed at trial, to determine whether the defendant is guilty. Rather, when we review the record, we do so in light of the error at issue. We ask whether there was little likelihood that the error affected the jury's verdict. We recognize that, if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict, then there is little likelihood that the error affected the verdict. However, that is not a finding about how the court views the weight of the evidence of the defendant's guilt. It is a legal conclusion about the likely effect of the error on the verdict."

336 Or at 32.

With the correct standard in mind, we conclude that the trial court's error in excluding Payne's lay opinion testimony was not harmless. As discussed above, in evaluating whether to affirm despite evidentiary error, "we review the record * * * in light of the error at issue. We ask whether there was little likelihood that the error affected the jury's verdict." *Davis*, 336 Or at 32. In so doing, we consider the nature and the context of the error. *Id.* at 32-33.

In this case, the trial court erred in excluding Payne's lay opinion testimony, which defendant offered to support his theory that the injuries that killed his daughter occurred several days before she died, and that nothing that defendant intentionally did to the victim on June 29 or 30 caused her death. Evidence that Payne thought that the victim looked like her daughter when she was suffering from a brain injury (or dehydration) on June 25 supported, but was not duplicative of, defendant's experts' testimony that the victim already was suffering from a brain injury at least several days before she died.

The effect of the error was prejudicial. As noted, Payne's testimony in the

offer of proof was that the victim looked like her daughter when she was suffering *either* from a brain injury *or* from dehydration on June 25. The trial court's ruling, under which Payne was allowed to testify only that she thought that the victim "looked dehydrated," rendered her testimony misleading, and it effectively undermined defendant's case and put the state in a better position than it otherwise would have been. That is so because the jury had heard that, on the evening of June 25, doctors at Santiam Hospital diagnosed the victim with dehydration. Testimony that the victim looked dehydrated on June 25 reinforced the innocuous dehydration explanation for her symptoms that day. The stricken lay opinion, on the other hand, would have provided the jury with additional evidence to support a finding that the victim already was suffering from a brain injury on June 25, as defendant's experts contended. In that circumstance, we cannot say that there is little likelihood that that error affected the verdict. Therefore, we reverse the ruling of the trial court excluding Payne's lay opinion and the decision of the Court of Appeals affirming that ruling.

*Evidence of the Victim's Prior Injuries*

We turn to defendant's argument that the Court of Appeals erred in affirming the trial court's ruling excluding evidence that the victim earlier had been subjected to physical abuse. As discussed above, defendant initially was charged with, among other things, murder by abuse. During defendant's first trial, the state introduced evidence that the victim had been physically abused as well as evidence of her prior injuries. Before the second trial, the court stated that, given the fact that defendant no longer was being charged with murder by abuse, it intended to try a narrower case and

33

was not inclined to permit the introduction of evidence of the victim's prior abuse or injuries, except to the extent that they related to the cause of her death. Defendant responded, however, that, in addition to other purposes, he intended to offer evidence of the victim's prior abuse and injuries to explain the basis for his experts' opinions that the victim died from injuries that were inflicted at least several days before June 29, 2002. He argued that his experts had reviewed the victim's medical records, including the autopsy report and tests showing healing broken bones, and determined that the victim had been subjected to chronic child abuse. Defendant explained that the experts would testify that that determination supported their conclusions that the victim's fatal injuries were inflicted in the period before June 29.

The trial court excluded that evidence, giving multiple alternative reasons for its ruling. First, the trial court ruled that the evidence was irrelevant to defendant's theory that the victim's preexisting abdominal injuries worsened on the night of her death, causing her preexisting subdural hematoma to rebleed. Second, the trial court ruled that the probative value of the evidence of prior injuries was outweighed by the danger of jury confusion. Third, the trial court ruled that the evidence was not admissible under OEC 404(3), which provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the
> character of a person in order to show that the person acted in conformity
> therewith. It may, however, be admissible for other purposes, such as proof
> of motive, opportunity, intent, preparation, plan, knowledge, identity, or
> absence of mistake or accident."

In that latter connection, the court stated that the prior injuries could not be tied to any particular person, and even if they could have been, they would not be admissible

34

because the defense had not shown that they were being offered for any admissible purpose under OEC 404(3). Finally, the court ruled that neither the defense's nor the state's experts were permitted to allude to the fact that the victim had been abused or that their diagnoses relied on the victim's previous injuries, except to the extent that they could tie the prior injuries to the medical cause of the victim's death.

As noted, the Court of Appeals affirmed the trial court's ruling without discussion. Defendant asks this court to reverse the Court of Appeals' decision in that regard. Defendant contends that he did not offer evidence of the victim's prior injuries as prior bad acts to prove anyone's character under OEC 404(3), nor did he contend that anyone was acting in conformity with his or her character in inflicting the victim's fatal injuries. Rather, he argues, the evidence is relevant because it tends to show that the victim had suffered repeated abuse, either negligently or intentionally, that the abuse began long before the victim died, and that that abuse may have included abdominal and head injuries that were inflicted prior to June 29 but that eventually resulted in the victim's death on June 30. According to defendant, his experts based their conclusions that the victim's fatal injuries occurred at least several days before the date of her death, in part, on the fact that the victim had been subjected to child abuse in the past. Defendant argued that his experts were entitled to explain that they reached that conclusion from their review of the victim's medical records and the autopsy and tests showing healing rib and leg fractures.

We agree with defendant that the trial court erred in excluding the evidence of the victim's prior physical abuse as a basis for the expert's testimony. Defendant did

not offer that evidence to establish any particular person's conduct or character; he offered it for another, permissible, purpose -- to establish the basis for his experts' conclusions that the victim suffered the injuries that resulted in her death before June 29. *See* OEC 703, 705 (expert may testify to reasons for opinion and facts on which opinion is based). It is true that defendant's experts did not tie any particular prior abuse, medically, to defendant's theory that, on the night she died, the victim suffered an exacerbation of her abdominal injury and/or a rebleed of a preexisting subdural hematoma. However, defendant did explain to the trial court that his experts concluded that the fact that the victim repeatedly had been harmed in the past was one of the bases for their opinions that the victim had suffered a brain and abdominal injury at least several days before she died. That is, evidence that the victim had suffered frequent serious injuries during the course of her life supported the experts' view that she also had suffered serious injuries the week or so before her death. That, in turn, made it more probable that, in the week before her death, the victim incurred the injuries that, in the defense experts' view, ultimately killed her.

The state argues, on the contrary, that evidence of the victim's past injuries was not relevant, because evidence that someone committed earlier child abuse is not evidence that defendant did not commit the fatal injuries on June 29. The state contends that there is no logical inferential connection between those two propositions. We think that the state's argument misses the point. As we have discussed, defendant's experts testified that the autopsy revealed that the victim died from injuries to her abdomen and brain that were inflicted at least several days before her death. The experts would have

36

testified that the fact that the victim also suffered other repeated physical injuries before June 29 supported those conclusions. The experts were entitled to explain the bases for their opinions and were not barred from doing so by OEC 404(3).[17]

As noted, the trial court also concluded that, even if the evidence were relevant, it should be excluded under OEC 403, because its probative value was outweighed by the risk of jury confusion. Although the trial court did not explain its ruling, the state argues that assessing who, if anyone, caused the prior injuries would have been confusing and pointless. We agree that evidence of *who caused* the prior injuries potentially would be confusing to the jury, and, more importantly, under the particular circumstances presented in this case, it would not be relevant to any issue of consequence to the jury's determination. Because the state elected to charge defendant with intentional acts committed on or between June 29 or 30, it was not important who, if anyone, injured to the victim before those dates.[18] As the state acknowledges in its brief

---

[17] If, on retrial, defendant again proffers and the trial court admits evidence that the victim was subject to prior physical abuse to support the conclusions of his experts, we recognize that the state may seek to use that evidence. We take no position on whether such use would or would not be permitted under the applicable rules of evidence.

[18] Although the state generally is not required to prove the specific date that a crime is committed, *see, e.g.*, *State v. Yielding*, 238 Or 419, 423, 395 P2d 172 (1964) (so holding), in this case, the date of the crime became a material element of the offense when the prosecutor elected to amend the indictment to charge the defendant with knowingly inflicting the fatal injuries on or between June 29 and 30, 2002, and the trial court instructed the jury that, to prove defendant guilty of murder and or manslaughter, the state was required to prove that "the act occurred on or between June 29th, 2002, and June 30th, 2002."

to this court, if the fatal injuries were inflicted before June 29, even if they were inflicted by defendant, defendant could not be convicted of the charged offenses. The jury therefore had no need to determine who, if anyone, was responsible for injuries inflicted before June 29.

That argument also misses the point, however. Defendant's experts testified that the victim died from injuries inflicted before June 29 and that those injuries (and not what occurred on June 29) were the precipitating cause of the victim's death. To support their testimony, defendant's experts were entitled to testify that they based their opinions, in part, on the fact that the child had been the victim of ongoing abuse throughout her life, as evidenced by her medical records and prior injuries. The experts' reasoning and the evidence on which they relied was not only relevant, it was necessary to aid the jury to evaluate their conclusions. The trial court erred in precluding the experts from testifying to the bases for their opinions.

Like the error in excluding Payne's lay opinion testimony, the trial court's error was not harmless. The expert's conclusions went "directly to the heart of defendant's factual theory of the case." *Davis*, 336 Or at 34. The trial court's erroneous exclusion of the evidence that the experts used to reach their conclusions could have affected the jury's determination of whether to believe the experts and whether there was reasonable doubt that defendant fatally injured the victim on June 29 or 30, 2002. On this record, we cannot say that there was little likelihood that the evidence of the victim's prior injuries affected the jury's verdict.

Because we conclude that that error was not harmless, we reverse the ruling

of the trial court excluding evidence of the victim's prior injuries, and we reverse the decision of the Court of Appeals affirming that ruling.

The decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.