KISTLER, J., dissenting.
The majority reverses defendant's convictions for sex abuse and attempted sodomy because it concludes that the admission of testimony about grooming was both erroneous *232 and prejudicial. In my view, this case can and should be decided on a narrow ground. Even if the admission of the testimony were erroneous, it was not prejudicial. The testimony that defendant had sexually abused and attempted to sodomize his 11-year-old stepdaughter was largely undisputed. Moreover, the conduct that a witness testified "could be considered grooming" consisted of defendant's going from massaging his stepdaughter's neck to massaging her chest and, when she objected, to massaging her lower back and upper thighs. If the jury found that defendant engaged in that conduct, the witness's testimony that the conduct "could be considered grooming" added nothing of substance to the mix. For that reason, I would affirm the Court of Appeals decision and the trial court's judgment.
Beyond that, this court held in State v. Marrington , 335 Or. 555, 73 P.3d 911 (2003), that an expert's testimony will be "scientific evidence" and thus subject to greater limitations on its admission whenever the "expert's assertions possess significantly increased potential to influence the trier of fact as scientific assertions." See id. at 562, 73 P.3d 911 (stating that standard; internal quotation marks omitted). As the majority's application of Marrington makes clear, the standard announced in Marrington has a broad reach. It depends on an assessment of the testimony's "potential" effect on the jury as scientific evidence and, under today's decision, can apply whenever the witness's expertise on grooming consist of nothing more than a discussion of that concept in college and in her training on interview techniques. If scientific expert testimony sweeps that broadly, we should recognize, as the federal courts have, that the test for determining minimum reliability that such testimony must meet will vary depending on the nature of the testimony. See Kumho Tire Co. v. Carmichael , 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed. 2d 238 (1999). However, because I would hold that any error in admitting the witness's testimony was harmless, I need not reach that issue to resolve this case. I respectfully dissent.
This opinion begins with the question of harmless error. It sets out the evidence in this case, which was largely undisputed. It then discusses the challenged testimony about grooming, which was, in context, minor. Finally, it explains why, in light of defendant's concession on review, his argument that the challenged testimony prejudiced him should fail. Not only does defendant's argument rest on a misperception of what the witness said, but it also fails to recognize that, in the context of the other evidence in this case, the testimony that defendant identifies as prejudicial had little likelihood of affecting the verdict.
The facts in this case are not complicated. The child at the center of this case was 11 years old when she testified at trial. She had lived with her mother and stepfather (defendant) since she was two years old.[1] At trial, she testified to two incidents in which defendant had either sexually abused her or attempted to do so: one when she was five or six years old and asleep in her bedroom, the other when she was 11 years old on a family camping trip. The latter incident gave rise to the charges in this case. The child also testified about massages that defendant had given her between those two incidents. In setting out the evidence, this opinion focuses, as the evidence at trial did, on those two incidents and the massages, as well as the events that occurred after the child disclosed defendant's abuse.
The child testified that, when she was five or six years old, she was in her bed in her own bedroom. Defendant got into bed with her and asked her "to touch his thing." She told him that she had to go to the bathroom, left her room, and got in her mother's bed. At trial, the child's mother testified that, after she learned of defendant's reported behavior, *233 she asked defendant (her husband) what had happened. "He said he didn't know."[2] However, defendant admitted to his wife that he had been sleeping with the child (his five- to six-year-old stepdaughter) in her bed when he allegedly asked her to touch him. When the child's mother was asked at trial whether she had sought to clarify what had happened, she said, "Um, I believe I did, yes." She testified that, in response to her questions, defendant had said that "[u]m, he was sleeping. He is a hard sleeper and that's when I [told my daughter] I won't let it happen again."[3]
Between the incident in the bedroom when the child was five or six years old and the incident on the camping trip when she was 11, defendant gave her massages "once in a while." Occasionally, she asked him to massage her shoulders, but defendant did not always stop there. The child testified at trial that at times defendant "would massage down my legs and up by my chest." When he massaged "up by her chest," it made her feel "sad" because "he was going too far into [her] other areas." She told her mother how she felt, but her mother told her "that he probably didn't mean it because he does it to me all the time."[4]
Later, the child told a CARES interviewer about one massage that occurred shortly before the camping trip. She said that defendant started massaging her neck but then began massaging her chest. She said, "I asked him to stop going down here [gestures toward her chest] and he was all 'okay,' and then he went down here [gestures toward her lower back and upper thighs]."[5]
Shortly after that massage, the family went on a camping trip. At that point, the child was 11 years old. The first night was marked by heavy rain, and most of the family were inside a small camper. Defendant and his wife had a bed at one end of the camper. A younger brother and half-brother had a bed at the other end of the camper. The child slept on a "really skinny" couch that ran along the side of the camper and was closer to her mother and defendant's bed. The child went to sleep first, then her younger brothers, and finally her mother. Defendant and a friend stayed outside until the "wee hours of the morning, around 3:00ish." After defendant and his friend came inside the camper, the child's mother woke up and realized that defendant was not in bed with her. He was sitting on the child's bed, and his wife began "trying [unsuccessfully] to pull him up" to their bed. Defendant's wife testified that she "couldn't [say] if [defendant] was still sitting [on the child's bed] or he was laying [on the child's bed]" when she went back to sleep. As she put it, "I rolled over and went back to bed."
The child testified that, when defendant initially lay down beside her, she woke up. However, "he was just laying there and [she] went back to bed."[6] The next morning, *234 as the sun was coming up, the child woke up and realized that defendant was "touching [her] in spots he shouldn't have." He had pulled down her sweat pants and underwear, and his hands were "between [her] legs and between [her] crotch." She rolled over on her stomach and then her side, turning her back to him. Then, she felt defendant putting his penis on her "butt cheeks" and "in [her] butt crack." Although there was no penetration, she heard him say "ahh" and testified that "[i]t felt wet." The child sat up, and defendant asked if she was okay.
The child's mother testified that, when she woke up, the child was sitting up in her bed, and defendant was asleep beside her. The mother asked her daughter to come up and get in bed with her, in the spot "where [defendant] was suppose[d] to be sleeping." The child got in the bed with her mother and went to sleep.
Later that day, the child told her mother that defendant "had rubbed up against her." When her mother asked what she meant, the child said that defendant had "rubbed up against her butt crack." Afterwards, the mother asked defendant whether he had rubbed up against the child's "butt crack," as she had reported. According to the child's mother, "[h]e's like, I don't know. I was asleep, I don't know." The mother testified that she understood that defendant "was sleeping, he rolled over and rubbed up against her. I didn't think any intent was behind there." At that point, the mother told her daughter that "we would, um, prop the bed up so he wouldn't be able to get in there the next night," which they did.
After the camping trip, the child and her older sister went to stay with their father, his fiancée (Tina), and Tina's children. While they were there, the older sister received a midnight text from defendant saying that he missed her, which struck Tina as odd. Later, while she was driving in the car with the child, Tina asked her, "[Y]ou know is [defendant] weird or is it just me[?]" The child responded, "[N]o, I don't like him." When Tina asked why, the child told her about the massages, that she had talked to her mother about the massages, and that her mother had told her that it was up to her to make defendant stop. Tina told the child's father about the massages, which led to the child's disclosing the abuse during the camping trip and the attempted abuse when she was five or six years old.
After hearing those disclosures, Tina and the child's father went to the police station. Although they had not contacted defendant,[7] defendant called the child's father while he was at the police station and left the following voice message:
"I really wish you would talk to me about it. Because, if I did do something, I didn't mean anything. I don't even know what I did. I know for a fact that I was not naked in bed. I, I wasn't. Please call me and talk to me about this because it-yeah, this is really, really messing with me man. And I know it's messing with you too. Thanks. Bye."
In addition to that testimony, the state called a CARES interviewer, Palfreyman, who had spoken with the child after her father and Tina told the police about the reported abuse. Palfreyman testified that she is a social worker who conducts forensic interviews for CARES. She told the jury that she had worked for CARES for four years and that she had had training as a forensic interviewer. Before that, she had worked for approximately six years for the State of Idaho in welfare and child protection. She said that her forensic training allowed her to talk to children as a "neutral fact finde[r]"; that is, her training taught her how to speak with *235 children at their developmental level and ask them "open-ended, non-leading questions."
Most of Palfreyman's testimony focused on her interview with the child, which she had recorded on video. The prosecutor played the video for the jury and asked Palfreyman questions about why she had done certain things. In the video, the child recounted the incident of attempted sexual abuse when she was five or six years old and the sexual abuse and attempted sodomy during the camping trip when she was 11 years old. She also told Palfreyman about the massage, discussed above, where defendant went from massaging her neck to massaging her chest and, when she objected, to massaging her lower back and upper thighs.
After showing the jury the video, the prosecutor asked Palfreyman whether she had any training regarding grooming. Over defendant's objection, Palfreyman said "Yes." The prosecutor clarified that Palfreyman was "not a psychologist or anything like that," and she agreed. When asked what sort of training she had had on grooming, Palfreyman said: "Um, just due to my forensic interview training we talk about grooming (INAUDIBLE) leading up to offending, and through my college courses, different trainings I've had." At that point, defendant objected again and asked that the jury be excused. The parties had a colloquy with the court outside the presence of the jury. When the jury returned, the prosecutor asked the witness three questions: (1) what activities "might be considered grooming"; (2) why a person would engage in grooming; and (3) whether "[i]n this particular interview was there any behavior that could be considered grooming."
In response to the first question regarding acts that "might be considered grooming," Palfreyman stated:
"spending time together, sometimes allowing the child to do things parents wouldn't allow like video games when it's not allowed or alcohol use. It would include things like giving them money for things, tickling, massaging, that sort of thing."
Palfreyman clarified on cross-examination that those acts could be completely innocent. Whether they constituted grooming depended on the actor's motive. She testified that, if the acts were done to "build trust and weaken defenses; if that's your motive for getting into this child's circle of trust, then that could be potential grooming."
The second question focused on why, if there were grooming, it would occur. The prosecutor asked, "So the grooming's done by the offender to sort of lay the ground work for later abuse?" Palfreyman answered, "Yeah, to build trust and weaken [the] defense[s] of the child."
Finally, in response to the question whether, "[i]n this particular interview was there any behavior which could be considered grooming," Palfreyman answered, "Um, when she just talked about the massaging where she wanted it on her neck but he would go lower into her chest area."
In arguing on review that Palfreyman's testimony prejudiced him, defendant focuses on one part of that testimony. Specifically, defendant admitted in his reply brief that he "does not contest" "that the behavioral science concept of grooming by offenders is well-established." Accordingly, he argued that "the issue is not whether behavioral science has validly established that nonviolent sexual offenders engage in certain behavior-it has." The problem in defendant's view was that "Palfreyman testified that defendant had engaged in particular behavior-specifically, massaging [his stepdaughter's] chest-that is recognized as grooming behavior by sexual offenders."
It is important to note that defendant is not challenging the effect on the jury of Palfreyman's generalized description of grooming-i.e. , her statement that grooming is a recognized type of behavior, her description of some activities that "might be considered grooming," or her explanation that, if a person engages in grooming, it is done to "build trust and weaken [the] defense[s] of the child." Rather, defendant's prejudice argument turns on one statement that Palfreyman made: when asked whether anything "[i]n this particular interview * * * could be considered grooming," Palfreyman replied, "[W]hen [the child] just talked about the *236 massaging where she wanted it on her neck but he would go lower into her chest area."
It is also important to note that, in arguing that that statement prejudiced him, defendant recasts what Palfreyman actually said. Specifically, defendant contends that "Palfreyman testified that defendant had engaged in particular behavior-specifically, massaging [the child's] chest-that is recognized as grooming behavior by sexual offenders." Palfreyman, however, did not testify that defendant had in fact engaged in the behavior that the child reported to her. She did not testify that the reported behavior is recognized as grooming, nor did she testify that defendant was a "sexual offender." Rather, what Palfreyman testified was that, in the "particular interview" that she had with the child, the child had reported behavior-defendant's massage that went from the child's neck to her chest-that "could be considered" grooming.
With that factual issue in mind, I turn to the applicable legal standard. OEC 103 provides that "[e]vidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits * * * evidence unless a substantial right of the party is affected." As this court explained in Dept. of Human Services v. G.D.W. , 353 Or. 25, 292 P.3d 548 (2012), "[e]videntiary error is considered harmless and is not a basis for reversal if there is little likelihood that the particular error affected the verdict." Id. at 39, 292 P.3d 548 (internal quotation marks omitted); see also State v. Davis , 351 Or. 35, 60-61, 261 P.3d 1197 (2011) (explaining that the question is whether there is little likelihood that the erroneous admission of evidence affected the verdict).
In making that assessment, the question is not whether there is persuasive evidence of a defendant's guilt. Davis , 351 Or. at 60-61, 261 P.3d 1197 (citing State v. Davis , 336 Or. 19, 30, 77 P.3d 1111 (2003) ). Rather, the question is whether there is little likelihood that the erroneously admitted evidence, considered in light of the other evidence in the case, affected the verdict. See State v. Hansen , 304 Or. 169, 180, 743 P.2d 157 (1987) (explaining that, "the less substantial the evidence of guilt, the more likely it is that an error affected the result").
In this case, the statement that defendant challenges was both limited and conditional. The challenged statement applied only to the single massage that the child had described to Palfreyman in her CARES interview. Palfreyman did not testify that defendant had, in fact, massaged the child in the way that the child described during her CARES interview, nor did Palfreyman testify that, if defendant had done so, his acts would be "grooming." Rather, in response to the question whether, "[i]n this particular interview was there any behavior which could be considered grooming ," Palfreyman responded, "Um, when she just talked about the massaging where she wanted it on her neck but he would go lower into her chest area." (Emphasis added.)
Before the jury could decide whether the reported behavior constituted grooming, the jury first had to find that defendant had in fact engaged in the behavior; that is, the jury had to find that defendant went from massaging his 11-year-old stepdaughter's neck to massaging her chest and, when she objected, to massaging her lower back and upper thighs. If the jury found that defendant had massaged his stepdaughter's chest, lower back, and upper thighs over her objection, the ability to label that behavior grooming added nothing to the facts that the jury found. Defendant's invasive behavior spoke for itself.
Moreover, Palfreyman testified only that the reported behavior "could be considered grooming." Even if the jury found that defendant had engaged in the reported behavior, it could not conclude that his behavior constituted grooming, as Palfreyman described the concept, without also finding that defendant had massaged the victim for an improper motive-to weaken her defenses and to lay the groundwork for later abuse. After all, not all massages constitute grooming. If the jury made that finding, the fact that Palfreyman's testimony permitted the jury to label defendant's behavior "grooming" added nothing of significance to the predicate facts (both the behavior and the motive) that the jury had to *237 find before it could conclude that defendant's behavior constituted grooming.
For that reason alone, I would hold that there was little likelihood that Palfreyman's testimony prejudiced defendant. Beyond that, both Hansen and Davis make clear that we also should consider the other evidence in the case because the likelihood that the erroneous admission of evidence affected the jury's verdict will vary depending on the strength or weakness of other evidence of guilt. In this case, the evidence of guilt was largely undisputed. No evidence contradicted the child's testimony about defendant's massage shortly before the camping trip. Nor was there any dispute that defendant had difficulty finding his own bed. It was undisputed that he ended up sleeping with his stepdaughter in her bed when she was five or six years old, and it was also undisputed that he ended up sleeping in his stepdaughter's bed again on the camping trip, even though his wife had tried to get him to come into their bed and even though the couch that defendant shared with his stepdaughter was "really skinny."
Moreover, in response to the child's report that defendant's fingers had penetrated her vagina and that he had attempted to penetrate her "butt crack" with his penis, defendant's only responses were that he did not know what had happened; that he had been sleeping; that if he did do anything, he did not mean to; and that, in any event, he had not been naked. Defendant's shifting and equivocal responses provide no viable basis for questioning the child's report.
The point of reciting that evidence is not simply to show that the evidence of guilt was overwhelming. Rather, the point is that, when the evidence is as one-sided as it was in this case and when defendant's denials are either nonexistent or strain credulity, any error in admitting Palfreyman's conditional testimony that defendant's reported behavior-massaging an 11-year-old child's chest, lower back and upper thighs over her objection-could be considered grooming is not likely to have affected the jury's verdict. The majority errs in concluding otherwise.
In reaching a contrary conclusion, the majority relies on what it describes as the "high degree of persuasive power" of scientific evidence and the extent to which the prosecutor "highlighted" grooming in his closing argument. On the first point, even if Palfreyman's testimony were scientific evidence, it was barely so. Palfreyman did not hold herself out as a learned expert. She testified only that she had learned about the concept of grooming when she was at college and as part of her training in forensic interviewing, which she described as teaching how to ask neutral, age-appropriate questions to children. Palfreyman did not testify that she had had extensive training in grooming, that grooming had been the subject of multiple studies, that she was an expert in identifying grooming behavior, or that defendant was a sexual offender because he had engaged in grooming. Cf. Marrington , 335 Or. at 562-63, 73 P.3d 911 (concluding that the jury would view a witness's testimony on delayed reporting as being based on scientific principles because she told the jury that she was a "nationally certified counselor" who taught classes on child sexual abuse, testified frequently as an expert on delayed reporting, and was familiar with an established body of literature on that subject).
Not all scientific evidence is equally persuasive. Given Palfreyman's limited credentials and her conditional testimony, the persuasive power of her testimony cannot be compared to that of an Einstein, an Edison, a Curie, or even a local physician identifying the cause of a patient's symptoms. Even if Palfreyman's testimony constituted "scientific evidence," we should not conclude that, because some scientific evidence has a high degree of persuasive power, Palfreyman's testimony did.
The majority also relies on the use that the prosecutor made of Palfreyman's testimony in closing. The majority states that, "[i]n closing argument, the prosecutor highlighted Palfreyman's testimony about grooming behavior." It then reconstructs the prosecutor's closing argument to draw the following syllogism from it. People who groom children are sexual offenders. Defendant was grooming his stepdaughter. Therefore, he was a sexual offender.
*238 The prosecutor's closing argument covers 21 pages of transcript. Only one paragraph in those 21 pages addresses "grooming." Most of the prosecutor's closing arguments focused on the camping trip. He also discussed the incident when the child was five or six years old, the child's statements to her mother and later to her father, defendant's shifting and equivocal responses to questions about what had happened when he was sleeping in his stepdaughter's bed (both when she was five or six years old and later when she was 11 years old), the mother's limited responses to her daughter's reports of abuse, and why, given her mother's previous failure to protect her, an 11-year-old child may not have told her mother everything that happened. The prosecutor also asked, not surprisingly, why and how defendant ended up sleeping in his 11-year-old stepdaughter's bed on the camping trip, especially when he knew that the last time he slept with his stepdaughter she reported that he asked her to "touch his thing."
Within that 21 pages, the prosecutor spent two paragraphs discussing defendant's massages. The first paragraph discussed the significance of defendant's massages without any reference to grooming. The prosecutor asked:
"Why is massaging in this case important? Why is the previous request to touch his thing important? For two reasons: one, it shows the fact that this defendant has a sexual inclination toward this child. It makes it less likely that he accidentally fell asleep next to her and just happened to rub up against her. It shows that he views this child as a sexual object."
The first and primary reason that the prosecutor told the jury that defendant's massages mattered was because they showed that defendant had "a sexual inclination toward this child," without any reference to grooming or Palfreyman's testimony. That is, the prosecutor argued that, if the jury found that defendant had engaged in the reported massages, it should infer that he had done so for a sexual purpose and that defendant's contact with her on the camping trip had not been inadvertent as he claimed. And, if the jury found that defendant's massages were sexually motivated-an inference that seems fairly obvious-the reference to grooming that follows, on which defendant and the majority rely, becomes surplusage.
The prosecutor then made a subsidiary argument about massages to the jury, which referred to grooming. He said:
"The massaging is important because it's grooming behavior. Courtney Palfreyman talked to you about offenders trying to get children accustomized (sic) to touching. The reason that they do that, folks, is to get them to a point where when later touching comes about they don't get the kind of reaction where the child walks out of the room, after he asks [her] to touch his thing, and they go tell mom. The child gets accustomed to the behavior, the barriers get broken down, and it makes it easier for an offense in the future. It's classic grooming behavior."
In that paragraph, the prosecutor argued that the massages were also important because they were "grooming behavior." While the prosecutor argued that defendant's massages constituted grooming and that they were done for the purpose of breaking down the child's resistance to his touching, the prosecutor did not ask the jury to infer that, because defendant had engaged in "grooming," he was a sexual offender.[8] The prosecutor's point was narrower. He used the concept of grooming to explain that what might be seen as innocent behavior-massaging a child's sore neck-can mask a darker purpose.
The prosecutor's reference to grooming was no different from using an officer's testimony that a defendant's possession of kitchen scales and small plastic baggies can evidence drug sales as well as innocent uses. The point is not that every person who possesses those items sells drugs. Rather, the point is to allow the jury to understand the *239 significance of evidence that might not otherwise be apparent. And, as discussed above, the jury could not credit the prosecutor's argument unless and until it found that defendant had engaged in the reported behavior for the purpose of breaking down the child's resistance. Palfreyman's testimony provided a label for the behavior but attaching that label to defendant's behavior would not have affected, in any material way, the jury's resolution of defendant's guilt.
Because I would hold that there was little likelihood that Palfreyman's statement affected the jury's verdict, I would not reach the questions whether her testimony was "scientific" evidence and, if it were, whether it was sufficiently reliable to be admitted. If those questions were properly before us, they raise a more substantial issue.
OEC 702 authorizes the admission of expert testimony based on "scientific, technical, or other specialized knowledge." This court has held that expert testimony based on "scientific" knowledge must meet a minimum standard of reliability. State v. O'Key , 321 Or. 285, 290, 899 P.2d 663 (1995) (explaining that, if expert testimony based on the correlation between rapid eye movement and intoxication "is 'scientific' evidence," it "must comply with the standard for admission of 'scientific' evidence; otherwise, it need not"). It follows that, under O'Key and our other decisions, the distinction between expert testimony based on "scientific" knowledge and expert testimony based on "technical, or other specialized knowledge" is key to determining its admissibility.
This court has defined what constitutes scientific evidence in three cases. The first case posited that "scientific" evidence is "evidence that draws its convincing force from some principle of science, mathematics and the like." State v. Brown , 297 Or. 404, 407, 687 P.2d 751 (1984). Eleven years later, the court recognized that it can be difficult to distinguish expert testimony based on "scientific evidence" from expert testimony based on "technical and other specialized knowledge." O'Key , 321 Or. at 291, 899 P.2d 663. As the court recognized in O'Key , " '[m]ost expert testimony rests at least partly on science.' " Id. (quoting Christopher B. Mueller and Laird C. Kirkpatrick, Modern Evidence § 7.8, 900 (1995) ). The court also observed that the greater the possibility that the jury will see the expert's testimony as resting on scientific assertions, the greater the court's responsibility for ensuring that the testimony is reliable. Id. at 291-92, 899 P.2d 663. However, the court concluded that the expert's testimony in that case was "scientific evidence" on the same ground that Brown had noted: The testimony drew its convincing force from a principle of science. Id. at 296-97, 899 P.2d 663.
Finally, in Marrington , the court went from asking whether the expert's testimony draws its convincing force from science to asking whether the "expert's assertions 'possess significantly increased potential to influence the trier of fact as scientific assertions.' " 335 Or. at 562, 73 P.3d 911 (quoting O'Key , 321 Or. at 292, 899 P.2d 663 ). The court concluded that the testimony in that case on delayed reporting had that potential because the witness had post-graduate degrees in psychology, she was a "nationally certified counselor," she had taught classes on child abuse, she was familiar with recent literature on delayed reporting, and she referred to a body of literature on the subject in her testimony. Id. at 562-63, 73 P.3d 911.
In this case, the majority applies Marrington and concludes from the fact that Palfreyman graduated from college, had a master's degree in social work, and had learned about grooming in her interview training that her testimony possessed a significantly increased potential to influence the trier of fact as scientific assertions. One might question whether, in light of Palfreyman's limited credentials, her conditional assertions about grooming posed a significantly increased potential to be seen as scientific assertions. However, the more troubling aspect of the majority's application of Marrington is that, if Palfreyman's testimony is scientific evidence, it is difficult to imagine much expert testimony that will not also be viewed as scientific. After all, virtually every expert's testimony can be seen as resting on scientific assertions, see O'Key , 321 Or. at 291, 899 P.2d 663, and presumably most experts will *240 have graduated from college and had some training in the subject on which they are testifying.
It follows that, after the majority's decision, the question ordinarily will not be whether the expert's testimony is "scientific." Rather, the question will be how much the proponent of the testimony must show to establish that the expert's testimony meets the minimum threshold of reliability. On that issue, the United States Supreme Court's decision in Kumho Tire provides helpful guidance. In Kumho Tire , the Court unanimously agreed that the gatekeeping function it previously had recognized for scientific testimony-ensuring that that testimony is "reliable"-cannot be limited to "scientific" evidence. The Court explained that not only does the text of FRE 702 apply, as the text of OEC 702 does, to "scientific, technical, [and] other specialized knowledge," but it "would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge." 526 U.S. at 147-48, 119 S.Ct. 1167. The Court reasoned that "conceptual efforts to distinguish [scientific knowledge from other subjects of expert testimony] are unlikely to produce clear legal lines capable of application in particular cases." Id. It followed, the Court concluded, that all expert testimony subject to FRE 702 should meet a minimum standard of reliability. Id. at 148, 119 S.Ct. 1167.
Having reached that conclusion, the Court recognized that the factors used to identify the reliability of expert testimony will vary depending on the expert testimony at issue. Id. at 150, 119 S.Ct. 1167 (agreeing that " '[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony' "; internal quotation marks omitted). That is, the Court recognized, as it previously had suggested, that a single set of factors for measuring reliability will not apply invariably to all expert testimony. Id. In my view, if we apply the concept of "scientific" evidence as broadly as the majority does, we also should recognize, as the Court did in Kumho Tire , that the test for measuring reliability will vary with the particular testimony at issue. However, we need not reach and resolve those issues to decide this case. As explained above, even if the trial court erred in admitting Palfreyman's testimony about grooming, any error was harmless. For that reason, I would affirm the trial court's judgment and the Court of Appeals decision.
Balmer, J., joins this dissenting opinion.

To preserve the child's anonymity, the majority refers to her as M. However, referring to her in that clinical fashion can obscure both her young age when these events allegedly occurred and the conflicting relationships in which she found herself, with a stepfather who reportedly was abusing her and a mother who, the jury could find, repeatedly sided with defendant and failed to protect her daughter. This opinion accordingly refers to her primarily as the child; when the context makes it appropriate, the opinion refers to the child as defendant's stepdaughter or her mother's daughter.

Defendant did not testify at trial. His statements that are set out in this opinion are taken from his wife's account at trial of what he told her, a statement that defendant filed with the police after his abuse was reported, and a voicemail message that he left for the child's father.

The mother testified that she first heard about the incident from a neighbor, that she "confronted" her five- to six-year-old daughter about saying such things to the neighbors, and that afterwards her daughter told the neighbors that the incident had not occurred. Other than that "recantation," no evidence directly contradicted the evidence set out above. The only evidence that indirectly contradicted that testimony was testimony that the child did not have a reputation for honesty and a weak suggestion that her initial failure to disclose the abuse to her biological father called her later report of that abuse into question.

The child's mother testified that she had seen defendant give her daughter a massage once when her daughter's neck was sore and that, as far as she saw, defendant's massage had been appropriate. The mother acknowledged that defendant could have massaged her daughter other times that she had not seen.

There is a video recording of the CARES interview, which was played for the jury and made part of the record. The description of the child's gestures, indicated in brackets, is taken from the video.

Later, defendant submitted a statement to the police, which was admitted into evidence. In his statement, he said that, when he came into the camper, he began massaging his stepdaughter's neck and fell asleep. Defendant's statement does not expressly say that he went to sleep in the bed with his 11-year-old stepdaughter, but that is the most reasonable, if not the only reasonable, inference from his statement.
At trial, the friend who had been outside with defendant and who had come into the camper with him testified that he saw defendant get into his wife's bed. The wife, however, testified otherwise, and defense counsel explained in his closing argument that the friend had been mistaken because, later that morning, the victim got into bed with her mother where defendant ordinarily would have been.

Apparently, Tina's older daughter had texted the child's older sister that Tina and the child's father were going to the police station, and the older sister relayed that information to defendant.

In his rebuttal argument, the prosecutor returned to grooming to explain that the state was not taking the position that, if a parent does anything for a child they're grooming that child and to counter defendant's argument that, because the child had reported that defendant abused her, the massages could not have been grooming.